# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION



| | |
|---|---|
| Marjorie M. Williams, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 9:10-cv-2881-RMG |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| Michael J. Astrue, Commissioner of the ) | |
| Social Security Administration ) | |
| ) | |

Plaintiff filed this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration regarding her claim for Disability Insurance Benefits and Supplemental Security Income. In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to a United States Magistrate Judge for pretrial handling. The Magistrate Judge recommended the decision of the Commissioner be affirmed. (Dkt. No. 15). Plaintiff filed objections to the Magistrate Judge's Report and Recommendation and Defendant filed a reply. (Dkt. Nos. 17, 18). For reasons set forth below, the Court reverses the Commissioner's decision denying Plaintiff benefits and remands this matter to the Commissioner for further action consistent with this decision.

## Legal Standard

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the

Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo* determination of those portions of the Report to which specific objection is made, and may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to him with instructions. 28 U.S.C. § 636(b)(1).

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of factual circumstances that substitutes the Court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

Although the federal court's review role is limited, "it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). Further, the Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

Rules and regulations of the Social Security Administration mandate that the Commissioner make a systematic and careful review of the medical record and other evidence presented by the claimant, which includes a reviewing and weighing of all relevant medical opinions and diagnoses. The Commissioner must evaluate each disability claim utilizing a five

step process, which begins at Step One with a determination whether the claimant is still employed. 20 C.F.R. § 404.1520(a). If the claimant is not gainfully employed, the Commissioner must consider at Step Two the severity of all of the claimant's impairments. An impairment is deemed "severe" if it "significantly limits" the claimant's "physical or mental ability to do basic work activities." § 1520(a)(4)(ii), (c). The Commissioner must then consider at Step Three whether any of the severe impairments of the claimant meet or equal the listings in Appendix 1, which would automatically establish the claimant's disability. § 1520(a)(4)(iii). If the claimant does not meet the requirements of the Appendix 1 listings, the Commissioner must at Step Four assess the claimant's residual functional capacity ("RFC") "based on all the relevant medical and other evidence." § 1520(a)(4)(iv), (e). Assuming that the claimant is not able to perform his or her past relevant work, the Commissioner must assess at Step Five the claimant's RFC and age, education and work experience to determine whether there is other available work the claimant can perform. § 1520(a)(4)(v), (g).

A claim of disability can be based on physical or mental impairments or a combination of both. The Commissioner is obligated to consider all "medically determinable impairments" and consider all medical evidence, opinions of medical sources and other evidence. 20 C.F.R. § 404.1545. "Medical opinions" include "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis . . . ." 20 C.F.R. § 404.1527(a)(2). Special consideration under some circumstances is given to a claimant's treating physician, and other factors considered by the Commissioner regarding the medical opinions of health providers include whether the provider examined the patient, the treatment relationship

with the provider and whether the provider is a specialist in the field in which the opinion is given. § 1527(d)(1)-(6). The Commissioner is obligated to "always consider the medical opinions" available in the record. § 1527(b). *See also,* SSR 96-8P, 1996 WL 374184 at *7.

In addition to analyzing all relevant evidence in the record, including all medical opinions, the Commissioner has the duty to set forth and analyze in his decision all relevant evidence and to explain the weight given to all probative evidence. As the Fourth Circuit stated in *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984), "[w]e cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." For instance, in making the RFC assessment, the Commissioner's decision "must include a narrative discussion describing how the evidence supports each conclusion" and must explain any conflict between the RFC assessment and any opinion from a medical source. SSR 96-8P at *7. Further, in assessing the credibility of the claimant regarding his or her subjective complaints, the Commissioner's decision must "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the [claimant's] statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186 at *1-2. Moreover, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement" that the claimant is not credible. *Id.* at *2.

**Factual Background**

Plaintiff filed an application for disability and disability insurance benefits with the Commissioner with an asserted onset date of May 31, 2006. Plaintiff has not worked since the alleged onset of her disability. She was 27 years of age at the time of her application for

benefits. Plaintiff based her application for disability on a variety of physical and mental conditions, including chronic and severe low back pain, post traumatic stress disorder and depression. The Social Security Administration denied Plaintiff's application for disability benefits and she subsequently sought review of that decision. An Administrative Law Judge ("ALJ"), after conducting an evidentiary hearing on January 15, 2009, issued a decision on June 5, 2009 finding that Plaintiff was not disabled. (Record [hereafter "R"] at 13-25). When the Appeals Council declined to review the matter, the ALJ decision became the final decision of the Commissioner. Plaintiff thereafter timely filed this complaint seeking judicial review.

Plaintiff asserts that she has severe, chronic and radiating low back pain that markedly limits her ability to function and to be productively employed. In support of her claim, Plaintiff has submitted a questionnaire signed by her longtime treating family physician, Dr. Michael Bernardo. (R. 179-184). Dr. Bernardo diagnosed Plaintiff with degenerative disc disease on the basis of an MRI, which has produced lower back pain and radiculopathy *Id.* at 179. He states the patient has no evidence of nerve compression or muscle weakness. *Id.* at 183. Dr. Bernardo states that Plaintiff can sit or stand less than two hours at a time and can only rarely lift ten pounds or less. *Id.* at 181.[1] He further opines that she can never stoop (bend), crouch/ squat, climb ladders or climb stairs and estimates that she would likely be absent from work more than four days per month. *Id.* at 182. He concludes that Plaintiff "is in constant pain and most medical avenues we have tried have not helped to relieve her pain." *Id.* at 184. Plaintiff also

---

[1] Plaintiff testified she could not lift more than 8 pounds and was unable to do laundry because she could not pick up the laundry basket. ( R. at 519). The record also contains documentation of an emergency room visit of April 23, 2008 for back pain following Plaintiff picking up her daughter. ( R. at 175).

submitted a November 2004 MRI which was interpreted to demonstrate no disc herniation or stenosis but the presence of "very early degenerative changes at L5-S1". *Id.* at 411.

Because of Plaintiff's persistent low back pain, she was referred by Dr. Bernardo to a pain specialist, Dr. Anterpreet Dua. Dr. Dua provided Plaintiff with a number of epidural steroid injections, which were documented to provide Plaintiff with only temporary and partial relief. (R. at 184, 261, 301, 344, 368, 374, 380). In the course of providing Plaintiff multiple epidural steroid injections for her severe pain, Dr. Dua consistently found the patient's physical findings unremarkable, straight leg raises negative and range of motion normal. (R. at 261, 301, 344, 369). Notwithstanding these clinical findings, Dr. Dua diagnosed Plaintiff with low back pain "secondary to degenerative disc disease and sacroiliac joint dysfunction." *Id*.

The Commissioner did not have Plaintiff evaluated by an examining consulting physician. Instead, two chart reviewers, one an internist and the other a general surgeon, completed a Physical Residual Capacity Assessment Form and reached remarkably similar conclusions that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds and could sit or stand six hours per day. (R. at 204, 216). Both chart reviewing physicians acknowledged that they were not provided the treating physician's statement regarding Plaintiff's physical capacities. (R. at 209, 221).

Plaintiff further asserts impairments relating to mental disorders, including post traumatic stress disorder and depression. Plaintiff attributes the origin of her psychiatric problems to an assault during a robbery at work more than a decade ago. She was treated and provided medications for her depression and anxiety by her family physician for a number of years and was subsequently seen in 2008 by a psychiatrist, Dr. Helen Mason. Dr. Mason diagnosed

Plaintiff with post traumatic stress disorder (309.81) and major depressive disorder (296.2x). (R. at 169).

Plaintiff subsequently underwent a formal psychological evaluation by Dr. Donald Salmon, a clinical psychologist, on September 23, 2008.[2] This evaluation included personality testing (MMPI-2) and cognitive testing. (R. at 142-143). Dr. Salmon's personality testing revealed "very strong feelings of depression and anxiety" and concluded that her day to day functioning was "compromised both by physical and emotional pain." (R. at 142). Dr. Salmon evaluated Plaintiff's activities for daily living and interpersonal functioning and determined there were significant limitations. He noted she was unable to take baths because of her back pain and her husband at times must help her with the shower. (R. at 143). Her ability to cook was limited because she found it painful to stand for more than five minutes. She informed Dr. Salmon she is able to drive and go to the store but "tries to avoid it as much as possible." *Id.* Because of her chronic back pain, any play with her two children must be done while lying in bed. *Id.* Plaintiff further explained that she is unable to attend church because she cannot sit that long because of the pain. *Id.*

Dr. Salmon diagnosed Plaintiff with post traumatic stress disorder (309.81) and dysthymic disorder (300.4). A dysthymic disorder is defined as "a chronically depressed mood that occurs most of the day more days than not for at least two years." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 345 (4th ed. 1994). The symptoms of dysthymic disorder "cause clinically significant distress or impairment in the social, occupational, or other important areas of functioning." *Id.* at 349. Dr.

---

[2] This evaluation was arranged by Plaintiff's attorney. (Doc. No. 10 at 11).

Salmon also evaluated Plaintiff on the Global Assessment of Functioning ("GAF") Scale and gave her a score of 45-55. (R. at 143). A GAF score in this range places Plaintiff somewhere between "serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job)" and "moderate impairment in social, occupational, or school functioning (few friends, conflicts with peers and co-workers."). *DSM-IV* at 32. Dr. Salmon concluded that Plaintiff had "moderate to marked limitations with regard to daily activities and social interaction, persistence and pace, and marked to extreme limitations with regard to concentration." (R. at 143, 147). He also opined that she would be unable to meet competitive standards for maintaining regular attendance at work, complete a normal workday and work week without interruption for psychologically based symptoms or deal with "normal work stress." (R. at 146).

The Social Security Administration relied on the reports of two chart reviewers to assess Plaintiff's psychological claims. (R. at 189- 202, 223-236). Both chart reviewers reached nearly identical conclusions regarding Plaintiff's impairments (not severe), diagnosis (depression NOS), category of medical disposition (affective disorder) and degree of limitations (none to mild). *Id.* Neither of the chart reviewers appear to have had access to the evaluations of Dr. Mason and Dr. Salmon and, of course, neither personally observed or tested Plaintiff.

The ALJ elected to give "considerable weight" to the non-examining medical consultants and did not give "great weight" to the opinions of Drs. Bernardo and Salmon. (R. at 23). He based his reliance on the non-examining consultants' opinions because the "claimant's daily activities, the claimant's non-compliance with treatment, and her failure to seek professional mental health treatment, does not support the degree of functional limitations" assessed by the

treating medical sources. *Id*. The ALJ further noted that Dr. Salmon evaluated Plaintiff on only one occasion and "his assessment is primarily based on the claimant's subjective complaints." *Id*. Plaintiff appeals from the ALJ's order and seeks reversal of the Commissioner's decision denying her benefits.

## Legal Analysis

Plaintiff's objections center on the alleged failure of the Commissioner to accord the opinions of treating medical sources the appropriate consideration and weight mandated by the regulations. In evaluating the opinions of medical sources, the Commissioner must give treating providers opinions "controlling weight" where their opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record . . ." 20 C.F.R. § 404.1527(d)(2). When a treater's opinions are not accorded controlling weight, the Commissioner further agrees to weigh that opinion on the basis of various enumerated factors, including the examining relationship, treatment relationship, length of treatment, nature and extent of treatment, supportability in the record and consistency. § 1527(d)(1)-(6). The regulations further provide that "[g]enerally, we give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." § 1527(d)(1).

In this matter, the ALJ has turned the treating provider rule on its head, giving effectively controlling weight to the opinions of chart reviewers, who have never laid eyes on Plaintiff, and cast aside the opinions of providers whose opinions are based upon some combination of testing, diagnostic assessment, and personal hands on evaluation. The opinions of Dr. Bernardo, Plaintiff's long treating personal physician, were given minimal weight allegedly because his

-9-

opinions were not supported by laboratory or clinical findings. (R. at 23). Dr. Bernardo based his opinions regarding Plaintiff's significant limitations on personal observation, response to various treatment approaches, clinical evaluation and the results of an MRI. (R. at 179-184). The ALJ accurately notes that various clinical evaluations of Plaintiff failed to detect limitations on range of motion, her straight leg raises were normal and her examinations were otherwise unremarkable. (R. at 20). It is well recognized, however, that certain pain syndromes will produce symptoms greater than that suggested by the objective medical evidence, and the Commissioner pledges to look to other evidence, including the statements of the claimant and the opinions of treating providers, to evaluate complaints of severe pain. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The ALJ concluded that Plaintiff's daily activities were inconsistent with the functional limitations found by Dr. Bernardo. (R. at 23). Specifically, the ALJ noted that the Plaintiff was "able to shower, fix breakfast, make her bed, drive, go out alone and grocery shop 30-60 minutes." (R. at 20). The ALJ's findings seriously overstate and mischaracterize the record in this case. First, in regard to the ability to take a shower, Plaintiff stated that her back impairment no longer allows her to take a bath and she at times requires the assistance of her husband to take a shower. (R. at 143). Second, in regard to the claim that she fixes breakfast, Plaintiff stated that her husband usually makes breakfast because she finds it painful to stand more than five minutes but she "is able to cook a small amount of cereal." (R. at 143). She also stated that her husband does most meal preparation but she can prepare "frozen dinners and sandwiches so I won't have to stand to[o] long." (R. at 106). Third, concerning the claim she is able to make her bed, Plaintiff stated that she is able to "straighten up bed with my child and husband's help." (R. at

104). Fourth, regarding her ability to drive, Plaintiff does have a driver's license but primarily relies on her mother or other family members to do the driving because of her back pain and the medication she takes to treat her severe pain. (R. at 506, 507).

The overwhelming evidence in the record supports the functional limitations found by Plaintiff's treating physician, Dr. Bernardo. Further, the Court finds that there is not substantial evidence in the record to support the finding of the ALJ that Plaintiff has minimal to non-existent limitations on her daily activities. The "cherry picking" and mischaracterization of the factual record by the ALJ does not constitute substantial evidence. Reversal and remand are obviously necessary to provide proper evaluation of the opinions of Plaintiff's treating providers. On remand, the Commissioner should evaluate the opinions of Plaintiff's treating sources in accord with controlling regulatory law, with particular attention to the length of treatment, examining relationship, continuity of care and other factors set forth in § 1527(d). As the regulation states, "[g]enerally, we give more weight to the opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings . . ." § 1527(d)(2).[3]

The ALJ's weighing of the psychological evidence is similarly flawed. Plaintiff's treating psychiatrist, Dr. Mason, and the evaluating psychologist, Dr. Salmon, both diagnosed significant depression related disorders. (R. at 143, 165). The ALJ concluded that Plaintiff's depression did

---

[3] The Commissioner on remand should also consider the side effects from Plaintiff's narcotic pain medications and their potential impact on her ability to maintain concentration, alertness and function over a workday. SSR 96-8p. As the ALJ noted, Plaintiff's pain medications have progressed to methadone and this and other narcotic medications have a well documented effect on a patient's level of functioning.

not even meet the relatively low bar for a "severe impairment" set forth in 20 C.F.R. § 404.1520(a)(4)(ii), (c) (an impairment is severe if it "significantly limits" the claimant's "physical or mental ability to do basic work activities."). This conclusion is based upon the premise that Plaintiff's depression "is effectively treated with medication prescribed by her primary care physician." (R. at 15). This finding is not supported by substantial evidence. Plaintiff's evaluation by Dr. Mason in April 2008 and Dr. Salmon in September 2008 aptly demonstrate the claimant's significant depressive symptoms and her testimony to the ALJ confirmed her continued depressive symptoms notwithstanding her ongoing treatment. (R. at 139-149; 169-170, 507-508).

The ALJ further justifies the disregarding of Dr. Salmon's opinions on the basis that he had evaluated claimant only once and "his assessment is primarily based on the claimant's subjective complaints." (R. at 23). Any evaluation by a psychologist necessarily involves the eliciting of information from the patient but Dr. Salmon documents the performance of diagnostic testing and careful evaluation that to the Court appears to be a model report. (R. at 139-143). To simply disregard this report and to rely in its stead on the superficial notations by chart reviewers, who have done no testing and have not personally evaluated the patient, violates both the letter and spirit of § 1527(d). Reversal and remand are necessary so that the Commissioner can apply the appropriate legal standard to the opinions of Plaintiff's treating and evaluating mental health experts.

## Conclusion

The decision of the Commissioner is hereby reversed pursuant to sentence four of 42 U.S.C. § 405(g) and remanded to the Commissioner for further action consistent with this

opinion.[4]

    AND IT IS SO ORDERED.

                                           Richard Mark Gergel
                                           United States District Judge

December 14, 2011
Charleston, South Carolina

---

[4] Plaintiff also objects to the ALJ's failure to explicitly address the Listing for spinal disorders at 1.04 during his Step Three analysis. While it would have been preferable for the ALJ to explicitly address the Listing as part of his Step Three analysis, the ALJ made specific findings, supported by substantial evidence in the record, that Plaintiff did not meet the Listing requirements at 1.04. Therefore, any error by the ALJ on this matter was harmless.